# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   MJ24-084 |
| The Target Device, more fully described in Attachment A | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, incorporated by reference.

located in the _____Western_____ District of _____Washington_____, there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8 U.S.C. Sections 1324(a)(1) (A)(ii), (v)(I), and (v)(II) | Illegal Transportation of Aliens and Conspiracy to Commit the Same. |

The application is based on these facts:

✓  See Affidavit of Krystle Mendoza, continued on the attached sheet.

☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

KRYSTLE L MENDOZA    Digitally signed by KRYSTLE L MENDOZA
Date: 2024.02.12 12:30:45 -08'00'

*Applicant's signature*

Krystle Mendoza
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:    2/14/2024

*Judge's signature*

City and state:   Seattle, Washington          S. Kate Vaughan,  United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF KRYSTLE MENDOZA**

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF WHATCOM            )

I, Krystle Mendoza, a Special Agent with Homeland Security Investigations, having been duly sworn, state as follows:

## INTRODUCTION AND IDENTIFICATION OF DEVICES

1.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the search and examination of the following digital device[1] or other electronic storage media[2] (the "**Target Device**"), further described in Attachment A and which is currently in law enforcement possession, for the information described in Attachment B. The **Target Device** is:

a.      A black Samsung cellular telephone, currently stored at the Blaine HSI Evidence Vault, located at 1380 Commerce Pl., Ferndale, WA 98248.

---

[1] "Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

[2] Electronic Storage media is any physical object upon which electronically stored information can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.



2.      The warrant would authorize the forensic examination of the **Target Device**, for the purpose of identifying electronically stored data particularly described in Attachment B.

## AFFIANT BACKGROUND

3.      I, Krystle Mendoza, am a Special Agent (SA) with the U.S. Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Assistant Special Agent in Charge (ASAC) Blaine, Washington, field office.  I have been employed as an HSI Special Agent since 2019.  I am currently assigned to the child exploitation / human trafficking unit in the HSI office in Ferndale, WA.  I am a law enforcement officer of the United States, who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code.  Prior to this, I worked with the Canada Border Services Agency from 2003 to 2018.

4.      In my capacity as a Special Agent, my daily activities include the investigation of charges related to the smuggling of goods, people, and contraband into

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and out of the United States.  I also enforce federal criminal laws relating to the unlawful
2  entry of individuals that have not presented themselves for inspection at a designated Port
3  of Entry.  I am responsible for conducting investigations into the numerous federal laws
4  enforced by HSI.

5      5.     I received training at the Federal Law Enforcement Training Center in
6  Glynco, Georgia.  While there, I completed the Criminal Investigation Training Program
7  and the HSI Special Agent Training Academy.  I have received training in interviewing
8  techniques, arrest procedures, immigration law, search warrant applications, the
9  execution of searches and seizures, and various other criminal laws and procedures.  I
10  have been the affiant on numerous search and arrest warrants.

11      6.     The facts set forth in this affidavit arise from my personal and direct
12  participation in the investigation, my experience and training as an HSI Special Agent,
13  my conversations with witnesses and other law enforcement personnel, including Border
14  Patrol Agents within the Department of Homeland Security, and information gleaned
15  from my review of reports and evidence related to this investigation. The discussion
16  below includes only the information I believe necessary to establish probable cause that
17  evidence, fruits and instrumentalities of violations of: illegal transportation of aliens, in
18  violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (v)(II), and Title
19  18, United States Code, Section 2; or conspiracy to illegally transport aliens under Title
20  8, United States Code, Section 1324(a)(1)(A)(v)(I), will be found on the **Target Device**.
21  I do not purport to summarize all the evidence gathered during my investigation, nor does
22  the discussion below include all facts known to me or others involved with this
23  investigation.

24      ## KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

25      7.     Based on my training and experience, including my experience in
26  numerous investigations and my discussions with other officers and agents, I am aware

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that it is common practice for human smugglers to work in concert with one another utilizing cellular telephones.  A common method utilized by human smugglers working at the U.S./Canadian border, particularly in the rural farming areas of Whatcom County, Washington, is to utilize a vehicle to drive over a shallow ditch that exists at much of the international border boundary line.  This method of transportation often requires coordination with other individuals via cellular telephones.  For instance, I am aware that smuggling coordinators in Canada frequently communicate and coordinate with the individuals responsible for smuggling persons or goods into the United States via cellular telephone.  These communications can occur before, during, and after the individuals arrive in the United States.  For example, prior to illegal importation, human smuggling coordinators frequently communicate via phone calls, text messages, and other messaging applications with the transporter(s) regarding arrangements and preparation for the smuggling operation.  Human smugglers communicate with the individuals they are transporting via phone calls, text messages, and other messaging applications to coordinate payment and logistics, such as where and when to pick the individuals up, how payment will be made and by whom, the mode of transportation the individual will be using to get to the pickup location, the location they are staying while awaiting being smuggled, who the individuals will be dropped off to and where, and to provide instructions.  In the case of an unaccompanied minor being smuggled, the smugglers may communicate directly with the parents or guardians of the child to coordinate all transportation arrangements and payment, to request and send updates and check on the wellbeing of the child, and to communicate with other family members about the smuggling arrangements.  When the movement is underway, human smugglers frequently communicate via phone calls, text messages, and other messaging applications with the transporter(s) to remotely monitor the progress of the smuggling operation, provide instructions, and warn accomplices about law enforcement activity.  When the

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    individuals have been smuggled into the United States, they may communicate with the

2    transporter(s) via cellular telephone calls, text messages, and other messaging

3    applications to provide updates, secure payment, coordinate drop-off, and receive further

4    instructions regarding the drop-off of individuals within the United States.

5    8.    I know, based on my training and experience, that persons who are

6    smuggled into the United States may be attempting to circumvent the United States

7    criminal justice system.  While certainly not always the case, persons who are smuggled

8    into the United States may sometimes have criminal or administrative charges against

9    them which would prevent their lawful admission into the United States.  Again, while

10   not always the case, persons who are smuggled may sometimes also be actively

11   participating in other criminal conspiracies with one another at the time of their

12   smuggling into the United States and are smuggled for the purpose of concealing those

13   ongoing schemes.

14   9.    The motivation for a human smuggler may vary.  Sometimes, the

15   arrangement is a simple monetary transaction.  Other times, a smuggler may be doing

16   someone a personal favor, repaying a personal debt, or may be actively trying to conceal

17   involvement in other nefarious activities, such as human trafficking.

18   10.    I know, based on my conversations with Border Patrol Agents and other

19   Homeland Security Investigations Special Agents, that undocumented non-citizens of

20   Romanian descent often make their first entry into the United States at the U.S./Mexico

21   border.  Border Patrol Agents on the U.S./Canada border often encounter Romanian

22   nationals who have already been documented as having entered the United States

23   illegally through Mexico.  It is also common that citizens of Romania refer to their close

24   friends as "cousins" or by other familial terms, though they may not actually be related

25   by blood.

26

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## SUMMARY OF PROBABLE CAUSE

2      11.     On November 11, 2023, ZAMIFR and ANDRONACHE were charged by

3   complaint with smuggling noncitizens into the United States at a place other than a port

4   of entry, in violation of Title 8 U.S.C. Section 1324(a)(1)(A)(i).  On November 15, 2023,

5   the grand jury charged ZAMFIR and ANDRONACHE with 12 counts of smuggling

6   noncitizens into the United States at a place other than a port of entry, in violation of Title

7   8 U.S.C. Section 1324(a)(1)(A)(i).  On February 7, 2024, the grand jury returned a

8   superseding indictment charging ZAMFIR and ANDRONACHE with 1 count of

9   conspiracy to illegally transport aliens, in violation of 8 U.S.C. Section

10   1324(a)(1)(A)(v)(I) and 12 counts of illegal transportation of an alien, in violation of 8

11   U.S.C. Sections 1324(a)(1)(A)(ii) and (v)(II) and 18 U.S.C. Section 2.  The below

12   summary includes details of my investigation.

13      12.     On November 9, 2023, at approximately 13:44 hours Border Patrol Agent

14   Colin McLean was performing line watch duties along the United States and Canada

15   border, in and around the city limits of Blaine, Washington.  Line watch is a blanket term

16   used by agents when referring to their patrol duties.  Those duties include responding to

17   sensor activity, looking for signs of cross border entries, checking known crossing

18   locations and remaining highly visible to deter illegal entries.

19      13.     At this time, Blaine Sector Communications Center advised Blaine Border

20   Patrol Agents that Blaine Sector Dispatch, via Remote Video Surveillance system, had

21   observed a white Ford Expedition parked at the north end of Harvey Road in Blaine,

22   Washington.  This location is right across the United States/Canada International

23   Boundary.  The location is approximately 1 mile east of the Pacific Highway Port of

24   Entry.  The location is not a designated port of entry or otherwise designated by a United

25   States immigration official for border crossing.  As dispatch relayed what they observed,

26   a total of 12 people had emerged from the brush and were observed entering the white

27

Ford Expedition that was parked at the north end of Harvey Road in Blaine, Washington. Based on my training and experience, I know that, in smuggling cases, it is common for individuals to travel from Seattle to predesignated locations in order to pick up subjects who want to illegally cross into the United States.  Based on my training and experience, I know that, in this scenario, it is common for the subjects to be loaded into vehicle(s) to be transported to Seattle or their final destination.

14.     In this case, all 12 subjects were observed loading into the white Ford Expedition, and the vehicle then headed southbound on Harvey Road towards H street. Agent McLean advised that he was enroute to the area.  As Agent McLean approached the location, he was able to see the white Ford Expedition turning east onto H Street Road and continuing south on Harvey Road, toward Pipeline Rd.  As Agent McLean caught up with the white Ford Expedition, he activated his emergency lights to conduct a vehicle stop.  The white Ford Expedition yielded to the emergency lights at the intersection of Harvey Road and Sweet Road.  Agent McLean approached the driver's side of the white Ford Expedition, identifying himself as a Border Patrol Agent.  Agent McLean noticed there were many individuals in the vehicle and ordered the driver to exit the vehicle with his hands up, in order to keep him from fleeing the scene.

15.     At this time, United States Customs and Border Protection (CBP) officers from the Office of Field Operations arrived and helped secure the scene.  In addition, at this time, Supervisory Border Patrol Agent (SBPA) Rodriguez and Border Patrol Agent Pena arrived.  During questioning of the driver, now identified to be IONUT MADALIN ZAMFIR, Agents McLean, Pena, and Rodriguez asked the driver if he had just picked up passengers.  ZAMFIR admitted he had just picked up the passengers on Harvey Road. Agent McLean conducted a search of ZAMFIR's shoulder bag and located his Missouri Driver's License, as well as a Romanian passport, which ZAMFIR stated belonged to the passenger in the front seat.  The Missouri driver's license identified the driver as IONUT

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  MADALIN ZAMFIR.  Agent McLean advised ZAMFIR that he was being detained for

2  immigration violations and was going to be taken back to the station for further

3  questioning.

4       16.    SBPA Rodriguez reported that he heard crying and screaming coming from

5  the white Ford Expedition and as SBPA Rodriguez approached the vehicle, he reported

6  that he saw the hatch back open, and children stacked on top of each other crying and

7  screaming for who appeared to be their parents sitting in the middle row of the SUV.

8  There were approximately three children in the back cargo area with no restraints.  SPBA

9  Rodriguez observed another child in the front passenger seat sitting on the center console

10 in the front of the vehicle.  SBPA Rodriguez counted a total of 13 individuals in the white

11 Ford Expedition, with the driver having already been previously removed from the

12 vehicle by BPA McClean.  With the inclusion of driver ZAMFIR, a total of 14 people

13 had been inside the white Ford Expedition.  SBPA Rodriguez overheard one of the

14 children speaking Spanish and began to communicate with the child in Spanish,

15 attempting to calm the child and their parents down.  SBPA Rodriguez identified himself

16 as Supervisory Border Patrol Agent Rodriguez and asked the adults to state their

17 citizenship in which they responded "Romania."  Several other individuals were observed

18 by SBPA Rodriguez and BPA Pena to include AHMED BASCRACEA, as well as I.A,

19 D.A, I.G, A.A, M.A, M.P, M.G, A.Z, I.P, F.Z, and A.P.  All 14 subjects were transported

20 to the Blaine Border Patrol Station and processed through immigration.

21      17.    The passenger in the front seat of the vehicle was identified as DANIEL

22 ANDRONACHE, based on his Romanian Passport that was located in ZAMFIR's

23 shoulder bag.  It was discovered that both ZAMFIR and ANDRONACHE were stopped

24 by Sumas Border Patrol Agent's (BPA) earlier in the day for suspicious activities in the

25 Sumas area of responsibility, based on a report involving the same white Ford Expedition

26

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 with the same license plate.  During this earlier incident, both subjects were released by

2 Sumas BPA after further field interviews could not determine their activities.

3      18.    On November 9, 2023, at approximately 7:03 p.m. an audio and video-

4 recorded statement was taken from IONUT MADALIN ZAMFIR at the Blaine Border

5 Patrol Station by myself and BPA-Intel Manuel Robles.  Before the statement was taken,

6 I read ZAMFIR his Miranda Rights.  I conducted the interview in English, as ZAMFIR

7 spoke English and stated his preference to have the interview conducted in English.

8 ZAMFIR voluntarily waived his Miranda rights and agreed to speak to law enforcement.

9      19.    ZAMFIR stated he is a Romanian citizen.  ZAMFIR stated that he arrived

10 in the United States three years ago, crossing the border illegally into the United States

11 from Canada via automobile.  ZAMFIR stated that he currently resides with his family in

12 Omaha, Nebraska.  ZAMFIR stated that he is currently in possession of a valid

13 Employment Authorization Document (EAD).  ZAMFIR admitted to being the driver of

14 the vehicle that picked up the 12 individuals crossing the border illegally from Canada

15 into the United States and stated that his 12 family members had flown to Toronto and

16 had rented a vehicle to drive to the area where they had crossed the border illegally.

17      20.    ZAMFIR stated that he flew from Omaha, Nebraska to Seattle, Washington

18 on November 8, 2023, with his cousin, DANIEL ANDRONACHE.  ZAMFIR stated that

19 he and his cousin DANIEL ANDRONACHE had flown in together, and that he had paid

20 for their plane tickets.  ZAMFIR said they spent the night at a hotel in Seattle before

21 driving to pick up their 12 family members in Canada.

22      21.    Based on a review of ZAMFIR's and ANDRONACHE's plane tickets, it

23 has been determined that ZAMFIR and ANDRONACHE actually flew into Seattle from

24 Nebraska on November 7, 2023.

25      22.    ZAMFIR stated that on the morning of November 9, 2023, he rented the

26 white Ford Expedition that he used to pick up his 12 family members.  ZAMFIR also

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    stated that earlier in the day, he and DANIEL ANDRONACHE were stopped by Border

2    Patrol Agents near Sumas/Lynden, while they were driving around site seeing.  ZAMFIR

3    stated that DANIEL ANDRONACHE had to use the bathroom and got out to urinate.

4    ZAMFIR stated that, while in the area, they gambled at the Nooksack Northwood Casino

5    for about 45 minutes.  ZAMFIR stated that he had a telephone conversation with the

6    family members, while they were waiting in Canada.  The family members stated that

7    they were waiting at a different area of the border.  ZAMFIR stated that after that

8    conversation, he and DANIEL ANDRONACHE drove to Harvey Rd., and ZAMFIR

9    stated that the family members crossed the border from Canada and got into the white

10   Ford Expedition that ZAMFIR was driving.  ZAMFIR stated that he picked up all 12

11   individuals that were in the vehicle when BPA McLean conducted the traffic stop.

12   ZAMFIR stated that he knew that the vehicle he was operating was designed to hold only

13   8 passengers.  ZAMFIR stated that they left the area but were stopped by Border Patrol

14   Agents.  ZAMFIR stated that he and his cousin, ANDRONACHE, had planned to pick up

15   his family members and drive 15-20 minutes and then switch to another rental vehicle.

16   From there, they had planned to continue driving to Seattle, Washington.  ZAMFIR

17   claimed that they did not have a standing appointment for another rental vehicle, but they

18   were just going to walk in somewhere.  ZAMFIR stated that he is aware that the 12

19   passengers he picked up had entered into the United States illegally.

20          23.     On November 9, 2023, at approximately 7:45 p.m. an audio and video-

21   recorded statement was taken from DANIEL ANDRONACHE at the Blaine Border

22   Patrol Station by myself and BPA-Intel Manuel Robles.  Before the sworn statement was

23   taken, BPA-Intel Robles read ANDRONACHE his Miranda Rights.  The interview was

24   conducted in Spanish by BPA-Intel Manuel Robles.  ANDRONACHE voluntarily

25   waived his Miranda rights and agreed to speak to law enforcement. ANDRONACHE

26

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

voluntarily signed ICE form 73-025, and myself and BPA-Intel Robles witnessed the signature. ANDRONACHE made the following statements:

24.    ANDRONACHE confirmed his full and correct name as DANIEL ANDRONACHE.  ANDRONACHE stated he is a citizen of Romania.  ANDRONACHE stated that, 18 months ago, he had crossed into the United States illegally around Tijuana/Baja with his wife, daughter, and son.  They were apprehended by United States Border Patrol.  ANDRONACHE has a pending immigration court date based on this incident.  ANDRONACHE stated he currently resides in Omaha, Nebraska. ANDRONACHE stated he works in construction and gets paid in cash for his work. ANDRONACHE stated he has a pending immigration asylum appointment on January 15, 2025.  ANDRONACHE admitted he was the front-seat passenger of the white Ford Expedition that picked up the 12 individuals crossing the border illegally from Canada. ANDRONACHE stated that all of the occupants in the vehicle were his family members. ANDRONACHE stated that the 12 family members he picked up from the border drove from Toronto, Canada in a vehicle to the area where they had crossed the border illegally.

25.    ANDRONACHE stated he had arrived in Washington two days ago, on November 7, 2023.  ANDRONACHE stated he flew from Nebraska to Seattle, Washington and stayed in a hotel room for two nights.  ANDRONACHE stated he flew with his cousin, IONUT MADALIN ZAMFIR, on the same flight from Nebraska. ANDRONACHE stated they came to border yesterday in an Uber.  ANDRONACHE stated the Uber took them to the Northwood Casino in Lynden, Washington since their family members were going to attempt to make an illegal entry into the United States using the vehicle they drove in from Toronto, Canada to Vancouver, British Columbia. ANDRONACHE stated that his family claimed they could not make entry into the United States as there were too many Border Patrol agents along the border.  ANDRONACHE stated that, at that time, ANDRONACHE and ZAMFIR took another Uber back to Seattle

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

for the night.  ANDRONACHE stated that they had rented the white Ford Expedition on November 9 from Seattle.  ANDRONACHE stated his cousin, IONUT MADALIN ZAMFIR, was the one who rented and paid for the car since he has the driver's license and credit card to be able to do that.  ANDRONACHE then stated they both drove to the border to pick up his family members.  ANDRONACHE stated that himself and ZAMFIR went to the casino area once again since they knew that area and hung around there until his family members could cross into the United States.  ANDRONACHE stated he had to go pee and got off near the border to relieve himself.  Border Patrol noticed him and pulled him and ZAMFIR over and asked them what they were doing in the area.  ANDRONACHE told agents he had to use the restroom and got off in the area to relieve himself.  Agents conducted their records checks and released them after they were done.

26.    ANDRONACHE stated his brother, I.A, who was in Canada, called and told him they were in another area away from their last location and asked him to move towards their location.  ANDRONACHE and ZAMFIR drove towards Harvey Rd located near Blaine, Washington where they waited for a few minutes for the family to cross into the United States.  Once in the United States, ANDRONACHE stated all 12 family members got into the white Ford Expedition and drove away from the area. ANDRONACHE stated they did not drive too far before being pulled over by Border Patrol.  BPA-I Robles asked ANDRONACHE why his family crossed through Canada and not through Mexico like him.  ANDRONACHE stated they crossed through Canada since they did not have the money to fly down to Mexico and cross there.

27.    ANDRONACHE was then asked if anyone within the group paid him for coming to pick them up and driving them to Seattle, Washington.  ANDRONACHE stated he did not charge any of them since they are all family. ANDRONACHE was then asked about the $3,100 USD that he had in his possession, and which was identified by

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | law enforcement during processing.  ANDRONACHE stated he earned the money from
2 | working construction and that he always carries cash since he cannot open a bank account
3 | due to not having any legal papers to do so.

4 |       28.    AHMED BASCRACEA was one of the passengers in the vehicle, along
5 | with passengers I.A, D.A, I.G, A.A, M.A, M.P, M.G, A.Z, I.P, F.Z, and A.P. All 14
6 | passengers, including BASCRACEA, were transported to the Blaine Border Patrol
7 | Station and processed through immigration.

8 |       29.    On November 9, 2023, BASCRACEA told Border Patrol Agents at the
9 | Blaine Station that he illegally entered the United States, and that he feared returning to
10 | Romania. BASCRACEA's Romanian citizenship and illegal entry into the United States
11 | was also verified through fingerprints, records checks, and a review of BASCRACEA's
12 | Romanian identity documents. In an audio-recorded statement on November 9, 2023,
13 | BASCRACEA also told me that he had legal guardianship of child passenger A.P.

14 |       30.    On November 21, 2023, another audio-recorded statement was taken
15 | from BASCRACEA at the Northwest Immigration Processing Center in Tacoma,
16 | Washington. I conducted the interview in BASCRACEA's native Romanian language,
17 | with use of a Romanian interpreter.

18 |       31.    BASCRACEA stated he drove himself and the child A.P. to the United
19 | States/Canadian border to meet defendants ZAMFIR and ANDRONACHE.
20 | BASCRACEA stated that he made plans with the other passengers to meet ZAMFIR and
21 | ANDRONACHE in order to cross the border illegally into the United States.

22 |       32.    On November 22, 2023, BASCRACEA was released into the United States
23 | from Northwest Immigration Processing Center, and informed immigration officers that
24 | he planned to stay in Richland, Washington with his family. He was enrolled in
25 | ICE/ERO's Alternatives to Detention supervision program via GPS tracking and released
26 | by immigration officials.

27 |

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     On January 17, 2024, BASCRACEA requested to travel to California. On January 19, 2024, BASCRACEA was served with a trial subpoena to appear as a witness in the trial of defendants ZAMFIR and ANDRONACHE in Seattle at the United States District Court on April 29, 2024.

34.     On January 24, 2024, at approximately 11:21 hours, BASCRACEA generated a tracker strap tamper alert believed to be due to BASCRACEA cutting off and removing the GPS unit. Case Specialist Gil was notified of the tamper alert and attempted to contact BASCRACEA at his contact number but was unsuccessful. ICE ERO Deportation Officer (DO) Bloom and Case Specialist Gil went to the last location of the GPS unit 6200 W. Clearwater Ave, Kennewick, WA 99336 which is an automotive repair shop identified as 360 Automotive & Repair.  DO Bloom located GPS unit BI LOC8 XT in the snow and slush and recovered the unit.  The strap of the GPS unit had been cut.

35.     On Sunday, February 4, 2024, BASCRACEA was apprehended by Canadian law enforcement while unlawfully trying to enter Canada at a place not designated as a port of entry. Canada Border Services Agency refused BASCRACEA entry into Canada and returned him to the United States. BASCRACEA was arrested on a material witness warrant at the Champlain, New York U.S. Customs and Border Protection port of entry.  BASCRACEA appeared for an initial appearance in the Northern District of New York on February 6, 2024, and was remanded to BOP custody.

36.     On February 4, 2024, when arrested, BASCRACEA was in possession of one black Samsung cellular telephone (the "**Target Device**").  The **Target Device** was found on his person. The **Target Device** was seized by HSI SA Dombrowski and documented on U. S. Department of Homeland Security Custody Receipt for Seized Property and Evidence number 2024SZ0036470.  On February 5, 2024, HSI SA Dombrowski shipped the **Target Device** to me via Fedex using overnight delivery. FedEx tracking number 7750 7438 9767 was provided for this shipment.  Upon seizure of

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the **Target Device** DHS Form 6051S (08/09) was completed by HSI SA Dombrowski and sent with the **Target Device**. On February 6, 2024, I received the Fedex package bearing tracking number 7750 7438 9767 which contained the **Target Device**. I accepted the item and completed DSH Form 6051S(08/09).

## TECHNICAL TERMS

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called "apps," which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.      Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every device attached to the Internet must be assigned an IP address so that Internet traffic sent

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

from and directed to that device may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.

        i.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38.    Based on my training, experience, and research, and from utilizing iPhone devices myself, I know that the **Target Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  I also know that these devices can access the internet from a wireless network connection, and that through the internet the user can access social media accounts, email accounts, bank accounts, third-party messaging applications, and conduct internet searches.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.    Based on my knowledge, training, and experience, I know that digital devices and electronic storage media can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet.  This information can sometimes be recovered with forensic tools.

40.    Based on information collected, including my conversations with other law enforcement agencies, I believe the **Target Device** is likely to contain evidence of criminal activity.

41.    *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Device** was used, the purpose of its use, who used them, and

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

when.  There is probable cause to believe that this forensic electronic evidence might be

on the **Target Device** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner and/or others with direct physical access to the computer.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.[3]   Additionally, some information stored within a computer or electronic storage media may provide

---

[3] For example, if the examination of a computer shows that:  a) at 11:00am, someone using the computer used an internet browser to log into a bank account in the name of John Doe; b) at 11:02am the internet browser was used to download child pornography; and c) at 11:05 am the internet browser was used to log into a social media account in the name of John Doe, an investigator may reasonably draw an inference that John Doe downloaded child pornography.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42.   *Manner of execution.* Because this warrant seeks only permission to search the **Target Device** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES

43.     Title 8 U.S.C. § 1324 prohibits illegally transporting aliens, and a conspiracy to commit the same.  Based on my training and experience, I know that an individual that illegally transports aliens may communicate via telephone with the persons being transported or picked up, and those communications may show the relationship between the individuals, such as if they know one another intimately, or knew the person when they lived in their home county.  The communications may further show the motive of the transporter, such as whether they are acting for a financial benefit or for a personal benefit.  The telephone communications electronically stored on a phone may also show instructions given by the transporter to the smuggled people which would aid in evading law enforcement, such as what statements to make or how to behave in the case of a law enforcement encounter.  In summary, based on my training and experience, the data maintained in a cellular telephone used by a person illegally transporting aliens can contain evidence of a crime or crimes, including the following:

a.     The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package.

b.     The stored list of recent received, missed, and sent calls is important evidence.  It identifies telephones recently in contact with the telephone user.  This is valuable information in a smuggling investigation because it will identify telephones used by other members of the conspiracy or the persons that are being smuggled.  Further, the information is helpful (and thus is evidence) because it leads to friends and associates of

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the user who can identify the user, help locate the user, and provide information about the user.

        c.     Stored text messages are important evidence, similar to stored numbers.  Agents can identify evidence of the smuggling activity, as well as friends of the user who likely have helpful information about the user, his location, and his activities.

        d.     Photographs and videos on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.  Also, digital photos often have embedded "geocode" or GPS information embedded in them.  Geocode information is typically the longitude and latitude where the photo was taken.  Showing where the photo was taken can have evidentiary value.  This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

        e.     Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

        44.     Based upon the evidence provided, it is reasonable to believe that the **Target Device** was utilized to facilitate the crime of illegal transportation of an alien into the United States, or a conspiracy to commit the same, in violation of 8 U.S.C. § 1324.

### SEARCH TECHNIQUES

        45.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or otherwise copying all data contained on the **Target Device**, and will specifically authorize a review of the media or information consistent with the warrant.

        46.     In accordance with the information in this affidavit, law enforcement personnel will execute the search of the **Target Device** pursuant to this warrant as follows:

        **a.  Securing the Data**

            i.     In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

produce a complete forensic image, if possible and appropriate, of the **Target Device**.[4]

ii. Law enforcement will only create an image of data physically present on or within the **Target Device**.  Creating an image of the **Target Device** will not result in access to any data physically located elsewhere.  However, **Target Device** that have previously connected to devices at other locations may contain data from those other locations.

### b.  Searching the Forensic Images

Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.

---

[4] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties.  Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess.  Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **CONCLUSION**

50.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Device** described in Attachment A, to seek the items described in Attachment B.

51.     The affidavit and application are being presented by reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3).

KRYSTLE L MENDOZA
Digitally signed by KRYSTLE L MENDOZA
Date: 2024.02.12 12:28:34 -08'00'

_____
KRYSTLE MENDOZA, Complainant
Homeland Security Investigations
Special Agent

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on this _14th__ day of February.

_____
S. Kate Vaughan
United States Magistrate Judge

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A**

The property to be searched is:

A black Samsung cellular telephone, currently stored at the Blaine HSI Evidence Vault, located at 1380 Commerce Pl., Ferndale, WA 98248.



This warrant authorizes the forensic examination of the **Target Device** for the purpose of identifying the electronically stored information described in Attachment B.

ATTACHMENT A
USAO# 2023R01009 - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

1

2       All records on the **Target Device** described in Attachment A that relates to the

3  illegal transport of aliens, or a conspiracy to commit the same, in violation of Title 8

4  U.S.C. § 1324, occurring from July 9, 2023 to November 9, 2023.

5                a.   Assigned number and identifying telephone serial number (ESN,

6  MIN, IMSI, or IMEI);

7                b.   Evidence of user attribution showing who used or owned the **Target**

8  **Device** at the time the things described in this warrant were created, edited, or deleted,

9  such as logs, phonebooks, saved usernames and passwords, documents, and browsing

10  history;

11              c.   Records of the Internet Protocol addresses used;

12              d.   Records of Internet activity relating to the crimes of investigation,

13  including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

14  web pages, search terms that the user entered into any Internet search engine, and records

15  of user-typed web addresses;

16              e.   Stored list of recent received, sent, or missed calls;

17              f.   Stored contact information;

18              g.   Photographs and video related to the crimes of investigation,

19  including any embedded GPS data associated with these photographs;

20              h.   Photographs and video that may show the user of the phone and/or

21  co-conspirators, including any embedded GPS data associated with these photographs;

22              i.   Stored text messages, chats, chat logs, and audio files related to the

23  crimes of investigation including Apple iMessages, WhatsApp messages, Facebook

24  Messenger, Blackberry Messenger messages or other similar messaging services where

25  the data is stored on the telephone;

26              j.   Records of location and GPS data;

27

k.   Evidence of financial arrangements, including fees and expenses, paid to illegally transport, or aid and abet the illegal transport, of individuals into the United States, including evidence of bank records, checks, credit card bills, currency, account information, and other financial records that exist on the **Target Device**;

l.   Evidence identifying the occupants of the vehicle that were illegally transported, including their alienage, their relationships to one another, and their prior or upcoming travel plans;

m.   Evidence of the accounts, facilities, storage devices, and/or services (such as email addresses, IP addresses, WhatsApp accounts, Facebook Messenger accounts, and phone numbers) used to facilitate the suspected crimes;

n.   Evidence relating to the identity of co-conspirators, criminal associates, or others involved in the illegal transport of the suspected crimes;

o.   Evidence of the travel to, or presence at, locations involved in the suspected crimes, such as load houses, the international borderline, or delivery points;

p.   Evidence relating to the identity, alienage, travel plans, and motives of any other non-citizen that was illegally transported;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

ATTACHMENT B
USAO# 2023R01009 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970